Okay, the parties that are going to argue are present and can hear. Yes, sir. Hi, Your Honor. All right. Before you, you have the First Division, I mean First District, Second Division Appellate Court, which in this case consists of Aurelia Puchinski, myself, Justice Smith, and Justice Terry Lavin. Our order in the sequence, in other words, this is Walworth Investments, LG versus MU Sigma, and it's 19-19-1937. So the procedure is, number one, the appellant will have their first shot at putting their case on. And at the end of that, we will ask questions. We will not interrupt you. So it's the 10 or 15 minutes, then we respond to what you've stated. Then the appellee will have their opportunity to make their presentation again for the period of time. And then at the end, we will ask questions. Then it's back to the appellant. It's what we'll do. You're ready to go. You may go. Excuse me, Justice Smith.  I understand that you've got our order that says we cannot close anything that comes out in this oral. So I just suggest to you, if there are things, be very careful. All right? So if there are a lot of things that are sealed, then in some cases, our lips are going to be sealed too. Understood. Okay. Good morning, Your Honors. May it please the court. Melissa Arbuscheri from Latham & Watkins on behalf of the plaintiff appellant, Walworth Investments. The decision below allows the fiduciary to commit outright fraud against his beneficiary. The court was supposed to be interpreting Delaware law, but no Delaware court has ever allowed such a result. And it would make Delaware an outlier among its sister states, including Illinois. Now defendants do not really dispute that result. They embrace it. In their view, Delaware law allows the fiduciary to immunize his fiduciary breach and fraud by simply inducing his beneficiary to contract away his claims. This is fundamentally wrong as a matter of law, but before launching into our legal arguments, I think it's important to take a step back and remember that at this stage of the proceedings, the facts stand undisputed. And the facts are as follows. Raj Ram was the founder, CEO, chairman of the board, largest stockholder of Mu Sigma. He encouraged the Ryan family to invest in his company. He traded on their credibility. And when the company started to take off, he wanted to get control back. And so he told the Ryan family that there was simply no upside left, that he wanted to take care of them, that he wanted to give them an early exit so they could invest in his next company. And so what did he do? On March 22nd, in a written email, he told Pat Ryan Jr. that the company had moved from explosive growth to steady growth. Two weeks later, he told all of the Mu but not the Ryan family that the company was, quote, poised for explosive growth. And the following day, the March report came out and showed exactly that, 16 percent growth, record-breaking revenues. Did he tell the Ryan family that? No, he did exactly the opposite. He told the CFO, do not send this report to the Ryan family. And he told everyone we need to, quote, move like lightning to get this transaction done. And when he succeeded, when he succeeded in getting Walworth to sell its shares, in regaining control of his company, in profiting at his beneficiary's expense, he bragged about it. He pulled up the March 22nd email. He forwarded along and he said, I am very proud of this email. It started the ball rolling for us. And his CFO agreed. It was a, quote, brilliant email because you tempted him enough without trying to oversell. That's probably the reason it worked. And worked it did because the circuit court here dismissed all of the claims against both Rajaram and Mu Sigma as a matter of law. That decision was wrong for three reasons. First, the general release language that's in the voidable because it was procured by a fiduciary without full disclosure. Second, Section 3E, what they call the anti-reliance provision, cannot be enforced for much the same reason. It also cannot borrow the fiduciary duty and fraud claims for other reasons as well. And third, if nothing else, unjust enrichment has to act as a backstop here under Illinois law. Let me walk through each of these in turn. Let's start with the release. A fiduciary cannot enforce a release against an unknowing beneficiary without a full and frank disclosure of the relevant facts. This is black letter law. It's the law in the vast majority of jurisdictions. It's the law in Illinois and it's the law in Delaware as the Heckman decision makes clear. Now, defendants appear to concede that the general release cannot bar the fraud and fiduciary duty claims, but the exact same reason means it also cannot bar the other claims in Walworth's case. Once the release is voidable, it cannot be enforced in its entirety. And defendants simply have no answer to the litany of cases across jurisdictions, across fiduciary relationships that apply this majority rule. They don't say so in so many words, but they seem to think that Delaware is just an outlier. An Illinois court should not reach that result, especially when there is a Delaware chancery court decision, the Heckman decision that says the exact opposite. Then there's section 3E, again, what defendants call the anti-reliance provision. That provision is unenforceable for the same reason. It was disclosure. Delaware simply does not allow directors of corporations to contract away their fiduciary duty of loyalty. There is a statutory provision. It's section 102B7. And it says that a director of a corporation cannot eliminate the fiduciary duty of loyalty. There's case law that applies the same reasoning with respect to contracts. And Delaware corporations are unique in that respect. Limited partnerships, LLCs can contract away their fiduciary duties. Directors of a Delaware corporation simply cannot. And the reason why is because the fiduciary duty of loyalty in this respect is sacrificing in Delaware. The seminal decision of the Delaware Supreme Court, Malone v. Brinkhead, could not have been more clear. It is an unremitting duty. It is not intermittent. It is the constant compass that has to guide every communication between a director and a shareholder. And the sine qua non of that duty is honesty. Now, defendants treat this argument like it's a Hail Mary or a fallback position. It's not. It is critical. And it helps explain where the circuit court went wrong here. It treated this as if it was just an arms-length transaction between two unrelated commercial parties. Defendants do the same thing. They will undoubtedly point, as they do in their briefs, to the cases in Delaware that enforce anti-reliance provisions. There are unquestionably dozens and dozens of cases there throughout the briefs of Delaware courts that deal with anti-reliance provisions. But what is remarkable, what truly stands out, is not a single one of them enforces an anti-reliance provision against an unknowing beneficiary. Not a single one dismisses a fiduciary duty claim based on an anti-reliance clause. And that's telling. They're going to talk about the Heckman decision, the one that I mentioned earlier, but that case does not decide this issue. For one thing, it was never briefed. If you look at the beneficiary's brief in that case, the anti-reliance discussion amounts to three sentences total, one in text, two in a footnote about an entirely different issue. And that's because it was a motion to dismiss the fiduciary duty claim. If you look at the decision itself, the discussion of the fraudulent inducement defense, there was no such claim in that case. The anti-reliance provision discussions about three paragraphs, and at the very end of the decision in footnote 51, the court said, I have made no ruling with respect to the fraudulent inducement defense. And if nothing else, the critical point is that the court denied the motion to dismiss with respect to the fiduciary duty claim, despite the anti-reliance provision. Now other courts have addressed this issue in the situation. In fact, an Illinois court has done so, and this is the fourth district's decision in Conn versus BDO side minutes cited at page 18 of our opening brief. And the court there refused to enforce an anti-reliance provision in these circumstances. And what the court said is that in those circumstances, a fiduciary must disclose all material facts before quote, diving through the escape hatch of a contractual disclaimer, a disclaimer there, the anti-reliance provision. So whether the contractual disclaimer is a general release or whether it's an anti-reliance provision, the rule is the same. There has to be full and frank disclosure. There was no such disclosure here. And for that reason alone, this case should go back for a trial on the merits. Now there are other reasons why section 3E is not enforceable and should not bar the fiduciary duty and fraud claims here. They're in our briefs. I won't walk through all of them today. I just want to highlight one and it has to do with the fraudulent concealment claim. This is the trans time case that we talk about in our briefs. And it was the subject of the supplemental authority we submitted to the court in late August and early September with the trans time case says is when you have a language like the language we have here, if the court's going to look at the language of section 3E, that it does not actually bar fraudulent concealment or omission claims. Trans time is on all fours. And if the court applies it, some of Walworth's claims have to survive, namely the fraudulent concealment claim and the fiduciary duty claim. Now, what I think defendants will say, we're not fighting about what trans time said. Defendants just don't think trans time is good law in Delaware. It is. And just three quick points on that. Number one, whatever fight exists among the Delaware trial courts on this issue, there is no fight with respect to claims for active concealment. When the reliance provision does not disclaim reliance on the completeness of the information that's provided, then active claims can go forward. Secondly, the trans dime line of cases is better reasoned. It's more consistent with Illinois law on this point. Illinois law makes the same distinction. The walls decision, which we said on page 17 of our reply brief, it's a Northern district of Illinois case, but it sums up Illinois law in this area. And it's also more consistent with Delaware law, which after all requires that the disclaimer be clear and unequivocal because of the abhorrence of fraud. And finally, if there's any debate, the fiduciary relationship here should break that tie. In the end, if the court thinks, despite all the arguments we've made in our brief and we make here today, that Delaware law absolutely compels it to enforce section 3E, then that's where the Illinois law of unjust enrichment has to do some work. An Illinois court is not required to allow a fraudster fiduciary to get away with what happened here, and it should not do so. Finally, if the decision below stands, the message being given to fiduciaries is clear. You can outright lie to your beneficiary to regain control of your company. You can actively conceal the truth and you can brag about it free, so long as you include a contractual escape hatch. That is not the law. The decision below should be reversed. And I'm happy to take the panel's questions. Questions? Yeah, I have a few. Let's go through just sort of some of the factual background that has been elicited in everybody's briefs here. So you've got two sophisticated parties here on both sides, right? That's what the court below believes. And you don't have a problem with calling your client sophisticated, right? Not for current purposes, because we don't think it does anything to vitiate the fiduciary relationship. So I think we can stipulate that for the argument. Okay. And in this instance, the other sophisticated party, Rajaram, is the one who sort of pitched this proposed SRA deal, right? That's correct. And in so doing, there was language put in by whoever he had, whatever lawyer, draft the SRA, which included Section 3E, right? That's correct. And the sophisticated plaintiff did what most sophisticated people would do. They reached out for legal advice, and had a lawyer look at this document. And that lawyer, Mr. Delmonico, strictly, or not strictly, but redacted certain information from 3E that was information that would have, could have been used by the other side to say, you know, that the shareholders not relying on anything that we're telling him about the state of the company, the financial state, right? That's correct. I don't think it was Mr. Delmonico, but yes, the lawyer for Walworth at the time. Okay. So Walworth's lawyer, I've got the language in front of me that's stricken out. Yeah. And the other side didn't demand that that be put back in, right? That's correct. Okay. So when you have a situation like this, where one side has all of the information about, you know, what's going on with their business, what are the duties of the plaintiff in this circumstance, in terms of due diligence, trying to find out that the other side is being square with them about what the profits are, what's going on with the business? Why is it, you know, all of a sudden a good idea to get out rather than try to hit the home run? There aren't any, and that really is our point. When you're in the context of a fiduciary relationship, you are entitled by law to be able to trust what the fiduciary is telling you and to trust that he's not lying to you, he's acting in good faith and so forth. And it is what distinguishes this case from all of the other ones that defendants rely on where there's unrelated commercial parties. I mean, if you look at the Delaware cases, these are unrelated parties, there's due diligence, extensive due diligence, there's data rooms and the like, it's just very different than the circumstances here. Okay, and so I want to go to another factual matter that you brought up in your argument, and that relates to the email that was sent the day after this deal was, quote, done by a defendant where he's basically bragging about the deal in which he said that he had downplayed the future of Mu Sigma to Mr. Ryan and Walworth, and that his CFO called that a brilliant move, right? That's correct. So, yeah, I'm not the smartest financial person in the world. But, you know, this seems like sort of a reverse Madoff, you know, Bernie Madoff is telling people that you're, you're making tons and tons and tons of money, when in fact, he was spending it. And in this case, Mu Sigma is saying, you know, it's not really the home run, we want to use you on future deals, just get out of this one and work with us. But then at the same time, everybody's patting them on the back for not pushing it too hard and getting Walworth and Ryan out of the deal, right? That's exactly right. Okay. What about the extrinsic evidence that can be used to talk about the language in this contract when you have two judges in the trial division over in the circuit court, one who says, summary judgment is inappropriate, because of the release language and the fiduciary language and all of the case law that we talked about. And then he goes to the appellate court and months and months and months later on reconsideration, another judge comes to completely different conclusion. How does that affect the way that we should look at this case in terms of whether or not summary judgment is appropriate or inappropriate under these circumstances? I think it certainly shows that there is ambiguity in the language, the fact that two judges can read it differently, or at least realize that it's open to ambiguity in that respect, I, you know, in one way, that would open the door to extrinsic evidence. But frankly, in the other way, it just means it can't be enforced under Delaware law, if it is ambiguous, if it's not clear and unequivocal, then the court just won't enforce it at all. I think that's all I have at this point. Thank you. Thank you. Aurelia? Counsel, could you tell me, there were two months of company reports that were not given to Walworth. And Walworth certainly knew they didn't get them. They've gotten them for months and months before, and then all of a sudden two are missing. Did they have no responsibility to say, what's the deal here? They didn't, I guess, two things. One is, I don't think there's any, not I don't think there are no allegations in the complaint saying that they realized they hadn't gotten them. Frankly, you know, the point here is that they trusted what Rajaram was telling them, they weren't looking to spot check that information, they took it at face value. And so they weren't trying to, you know, see if the reports, they certainly didn't know that he was actively hiding those. I understand that. But they've said in the contract that they received all the information that was necessary to make this decision. And then there's an integration clause. So if they have months and months and months of reports, and then all of a sudden two are gone, a sophisticated investor might think that was fishy. I think that's absolutely true. If you're dealing with an unrelated commercial party. I actually think the fact that it didn't happen here just furthers our point that there was trust in this relationship. I mean, they didn't even negotiate the price here. There wasn't any due diligence. They trusted what Rajaram was telling them. They didn't think they had any reason to doubt him at this particular point. The defense in their brief mentions a quite really astounding return on the investment. Do you dispute that return on their investment? I don't. But I think what the defendants also don't mention is what the return on their investment would have been if they stayed with the company. I'm just talking about what they say. And you don't dispute that. Now, Judge Griffin entered his order in March of 2018 before the Chiron case. Judge Kubasiak had the benefit of the Chiron case. Does that change your analysis, honey? It does. And I think to the extent that the Chiron case was relevant at all, it's not to any of the arguments we're making on appeal. Our frontline argument has nothing to do with the text of the anti-reliance provision. And Chiron did not deal with the fiduciary relationship at all. So our frontline argument isn't impacted by that decision in the slightest. Even the textual argument that we're making with respect to the language here, the big difference between this case and Chiron is that here the parties did include reliance language in other parts of the contract. And they just didn't do so in this provision from the perspective of Walworth as Justice Lavin noted, that was language that was in there and was later taken out. And so Chiron just doesn't have the same facts and it doesn't have the same language. Well, this case does though have a section five release and section 610 and 6, I'm sorry, 6F and 6G integration clauses. Don't you have to read them all together as part of the contract? Yes, I think to an extent. I'm not sure the release really, the only case that they point to that involves, they say a release is the ABRI case. And it wasn't a general release like the anti-reliance provision. And so I think as far as the integration clause, we have no problem with the court reading them together. We just don't think it goes to the place that defendants think it does. Again, first, because even if you thought the language was clear as day and actually added up to a clear and unequivocal anti-reliance provision, our frontline argument is that it still would not be enforceable here because of the fiduciary relationship and because a full disclosure was not made. The second, I'm sorry, go ahead. Okay. I get the whole fiduciary relationship argument and I'm, you know, I see where it's coming from. But when you sign a contract that says this agreement and warranties set forth the agreement, regardless of any investigation or lack of investigation, the agreement contains a complete agreement. The stockholder forever generally and completely releases known and unknown suspected and unsuspected conduct or omissions occurring to prior to the date, all of that language together. So how they don't work together? I think they don't because of the ambiguity I mentioned that it doesn't say reliance with respect to Walmart than it does in other places. In addition to the ones we talk about in our brief, you could look at section three H which talks about tax issues and there's reliance language in there as well. In other contracts between these parties, there is reliance language. There's not here. I think that's notable. But secondly, I think even if you disagree with me on that, what this language absolutely does not do is preclude the fraudulent concealment claims. The trans dime case had the same language. And what the court there said is if you're not going to disclaim reliance on the completeness of the information provided, you're going to be able to go forward with your fraudulent concealment claim because there's nothing inconsistent there. Okay, thank you. I'm going to may proceed. Thank you very much. It pleased the court. My name is Alan are found from Paul Weiss. And I'm here representing the defendants at Belize. That's mu sigma company and the CEO of that company, Mr. Raj Ram. The core issue on this appeal is quite simple. Under Delaware law, should a sophisticated party represented by sophisticated counsel be held to the plain terms of the agreement it negotiated? Here, the agreement which is a share buyback agreement contained an anti reliance clause, it contained a release, and it contained an integration clause. All the circuit court did below was enforce those terms as written. And if this court as it should does the same thing, all of their claims disappear. I want to just comment, before I go into the arguments that were made by the other side, just to step back and again, discuss what's the case all about? I think I can do it quickly, because the other side, I think conceded to what happened here. It was a May 2010 transaction, which mu sigma repurchases all of what were shares in the company was a deal between sophisticated parties, they agreed to that there were sophisticated lawyers involved. And they made a small fortune. They put in a million five, they got back over 9.3, a 620% return. And then they say they learn maybe there was a claim a few months after, and then they waited and they waited and they waited and was six years later, when the company does well, they show up and they said, Aha, there were some kind of positive and outside the contract, and therefore you defrauded us and breached our fiduciary duties. But if you apply the contract as written, that just doesn't work. They specifically and affirmatively represented, they didn't just agree to it, they represented to us that they were not relying on any statements outside of the party's agreement, quote, regarding any aspect of the sale purchase of the stock, the operation or financial condition of the company, or the value of the stock. And let me just comment there was one justice Levin mentioned one thing during the negotiations, there was some language in there about relying about Walworth not relying on any anything the company said that was removed. But there was a very good reason for that. If you the representations of Walworth, on which we we were entitled to rely, mu sigma was entitled to rely. And section four has the representations by mu sigma that they were entitled to rely upon. So that bit of the legislative negotiating history actually fully supports what we're saying, which is all they agreed to rely on was what was in the section four. And that's not their claim. Their claim is about these weird, ambiguous kind of statements that were a little bit negative about the future. And in fact, the only two things that were mentioned today, they mentioned the no upside left comment. In deposition, Mr. McGree, that was never said to him. He knew there was an upside left because he had the January report that showed they were going to still grow. And that statement, she quoted from one email that said, we're moving from explosive growth to steady growth. That was true. That's exactly what the facts showed. They had a much higher rate of growth originally. And then it slowed down during the Great Recession. So it's not really clear what this great fraud lie is all about. Having said that, let's go to the legal issues here, because I think they were somewhat confusingly jumbled. And I think that's been a big problem with us as to the other side, what they did in the brief. And again, in the argument, you really have to take this step by step, just as the court did below. Step one, there's an anti-reliance clause, which reinforced by the release and the integration clause was held below, and in our view, clearly eliminates the fraud and breacher fiduciary duty claims. Now, why is that? That's because Delaware has a very, very strong policy that you can't lie, you can't say in the contract, I only relied on what's here, what's here in the contract, and then show up in court years later and say, well, you know, there were these statements that were kind of made to us you're proving yourself a liar, and in the worst kind of circumstances, in a written agreement, because you told us you didn't rely on this. They have a little bit of quibbling that this maybe isn't an anti-reliance clause. But I think that's kind of gone by the boards, they kind of stuck that in the back. And you didn't hear a lot about that. And that's because the language here is very similar, like the Chiron case that Justice By the way, that was their main argument below. On re-argument below, and now here, the main argument is, aha, let's not enforce this language. I know it's there. I know we agreed to it. But let's ignore it. Let's forget about it. Why? Well, our contract is with Mu Sigma, that's a corporation that does not owe us any fiduciary duty. But it was negotiated by its CEO, Mr. Rajaram, and he owed us fiduciary duties. So therefore, because it was negotiated by someone who owes fiduciary duties, you can just rip up that agreement and throw it away. There's not a single Delaware case that says that. Let's be very clear, they're going to give you lots of policy and generalizations. They don't have a single Delaware case that said, Oh, you can come to court and lie. You can come into court and say, Oh, I didn't mean it when I said in my anti-reliance clause, I was only relying on what's here. You can throw that out because the guy negotiated with owed me a fiduciary duty. That is just not consistent with Delaware law. It's not consistent with this Heckman case that they love, where I'm sorry, I heard a lot of argument about it. But the fact is, when you read the decision, that was a decision that was an agreement between a corporate director and the corporation to which it owes fiduciary duties. And they said the corporation couldn't assert this affirmative defense of fraudulent inducement or concealment because couldn't allege fraud. Because it agreed it was only relying on what was in the contract. It enforced the anti-reliance clause, even though the person involved was a fiduciary. But it's worse than that. And there were two cases you did not hear about in this argument. Why is it they are saying that the fiduciary changes the situation with the anti-reliance clause? They're saying it's because the fiduciary has a duty of full disclosure. Yes. That proposition is blatantly false. This court, this court, in a case called Sims v. Tezak, the Illinois Appellate Court, applying Delaware law, said, uh-uh, we are not extending Delaware law. There was a sheer buyback, just like this one. And people came in later and they said, oh, they didn't tell us this thing and this thing. And they have a fiduciary duty of full disclosure under Delaware law. This court said, we decline your invitation to extend Delaware law and for the first time hold that there's a duty of full disclosure by the fiduciary in a sheer buyback. This case, this court held that 22 years ago. That's exactly what they're asking here. They're asking you to say there was a duty of full disclosure. You've held it. There isn't. Not only that, it turns out you were 100 percent right to so hold. You didn't hear any mention, shockingly, because to me it's the most, maybe the most important case on this appeal. There's a domain decision that was decided while this case was on appeal. And it was a sheer purchase instead of a sheer buyback. But they held right on point that this court was right in Sims v. Tezak. They and they say, you're absolutely right when you have an individually negotiated contract and you have two sophisticated commercial parties, then there is no fiduciary duty of disclosure. You do not have an obligation to give every single material fact you can think of. You have sophisticated parties who are sophisticated. They have lawyers. They can ask for what they can ask for. They can put in the contract what they can put in the contract. You don't have some duty to blab everything, you know. And that was Doman. Sims v. Tezak and Doman read together completely ends this case. It ends this whole fiduciary argument. So I just want to reinforce those are the two decisions that really are the most critical. Uh, you also heard a, uh, by the way, this email that they talked about, I maybe I should have mentioned that there's nothing that says in there that anything inaccurate was said to the other side. I want to be very careful, clear about that. Um, second argument I think we heard was, well, okay, maybe, maybe you're right on all of that, but, you know, I had this, um, uh, there was, there were these two reports that you didn't give me, by the way, those two reports aren't even in the record. I mean, that's a little, they really mattered and they didn't show anything. So I want to be clear that really is a big, uh, nothing as well. So where do you get to next? Next they say, well, there's this trans dime case that says, okay, maybe you didn't make any misrepresentations to me, but there were omissions, right? Maybe under an anti-reliance clause because reliance is required to prove both fraud claim and a breach of fiduciary duty claim. So now I've agreed, I'm not relying on anything outside the contract. So now I can't prove either those claims. Well, maybe I can prove you defrauded me by omissions. You omitted something. Maybe I can't say you're misrepresented, but you omitted it. Uh, and that's what trans time's about. If you actually read trans time carefully and you read all the decisions carefully, they all say, the one thing you can't do is show up and say, you made misrepresentations ABC. Uh, okay. There's a non-reliance clause. I won't rely on those. What you didn't tell me was not A, not B, not B. In other words, just flip them around. Like if you did tell me there was, uh, no upside left, which we didn't say, then you were omitting the fact there is not, there is upside left. You see, they're just playing with the language. They're just flipping it around. And every Delaware case, including trans time, which we do think is bad law, but even trans time said, you can't do that. You can't get into this cute pleading trick where you say on the one hand, X, you say, uh, as I said, there's no upside left and then say, well, okay. I can't, I can't claim that you misrepresented that because what I'm going to do instead is say, uh, you omitted to say there was upside left. I mean, that just doesn't work. That's a cute pleading device. Every case in Delaware, including trans time and including the cases that there are only a couple agree with trans time. Most of the cases do not agree with trans time, but even in the couple that do say that's a pleading trick, you can't get away with that. And that's all they did here. That's all they did. And by the way, even though the majority of cases have said trans times wrong, the narrow exception that trans time said was okay or might be okay is where there's active concealment, not fraudulent concealment. That's a very broad term. Active concealment. You had to have cases where somebody specifically asked for certain information and then was lied to about that information was given false information in response. That's active concealment. We asked about the relationship with customer X. You said it was fantastic. And in fact, you knew it was terrible. We asked for your financials. You gave me a set. They were, they were false. There's nothing like that alleged in this case. Nobody gave false information. In fact, if you look at the reports again, the one that's in the record, January one, those were all accurate. And there's never been an allegation that any of the financial information that was inaccurate. Okay. Let me just try to then sum up just very, very quickly. Then that takes care of the breach of fiduciary duty and fraud claims. They are barred by the anti-reliance clause as further supplemented by the release and the integration clause. There are two other no question about it. The release says I'm releasing you for many claims for events, including any claim based on events leading up to the contract. The contract claim, which is that you didn't give me those last two results reports is a claim against by the way, new Sigma, which did not owe any fiduciary duty. That's clearly covered by the release. The unjust enrichment claim against new Sigma. Again, new Sigma doesn't know any fiduciary duties that is clearly released. Their only argument is as to the unjust enrichment claim as applied to Mr. Rajaram. And there, it's clearly within the scope of the release. And he's just a corporate officer. Every release of a corporation includes the officers and directors. So he is released. That's a standard provision for all of these releases of the corporation. In addition, even if that weren't enough the unjust enrichment claim fails for two reasons very quickly. One, there's a written contract that covers the party's relationship. And two, there's a stand or fall rule under both Delaware and Illinois law. If you tie your unjust enrichment to the same facts that form the basis for your other claims, your tort claims, or here the fraud and fiduciary duty claims, you stand or fall the unjust enrichment claim stands or falls with those claims. If those claims are thrown out as they should be here, then that claim falls. Thank you very much. Questions? All right. Let's go. I've got two things I want to talk about. The first one goes back again to the section 3E subsection 2, in which the following language was redacted or removed. And I'll quote, that stockholder is not relying upon the company or any of the company's related parties in making its decision to sell the repurchase stock to the company pursuant to this agreement. That was stricken from this SRA. And to you, that doesn't make any difference. That doesn't create a question of material fact for a fact finder like a jury in this case, right? No. And can I explain why again? Of course, sure. If you look at the agreement, that was an earlier draft of the agreement. If you look at the agreement, what they subsequently did is they added an entire section for representations of the war and warranties of the company. And clearly, those are representations and warranties, they could rely on, they could over. If all these guys did when they came into court was sue for breaches of those reps and warranties, I wouldn't be able to argue the anti-reliance clause because they're in here. So that change actually did not make a difference. And in fact, supports it, our position, because what they replaced it with were representations and warranties on which they could rely, as opposed to in 3E, they represented to us that they were not relying on anything outside of this agreement. So no, I think that legislative history, in fact, if anything, fully supports our view. And we think the contract's unambiguous on that point. So let's set aside the contract for the moment, release language, whatever language that you can out. Let's just set that aside for a moment. In terms of the facts of this specific transaction, it was the day after the transaction closed that Rajaram sent this email, patting everybody on the back, congrats, we now own more of Mu Sigma. And then the exchange with and he is congratulated, patted on the back by the CFO saying that the earlier email to Ryan was brilliant. And that attempted the plaintiff enough without trying to oversell. That's probably the reason why it worked. That's not a particularly good argument to put in front of the jury, is it? Well, note a couple things. One, it says without trying to oversell, it doesn't say he oversold, it doesn't admit he said anything wrong. All it says is that email was a good email in the sense that led to a transaction that we're happy with. Presumably, Ryan was happy too. He was happy with the transaction. I mean, I don't think those emails really add up to anything because they don't say, oh, you lied or we misled or anything like that. They said we entered into a good deal and we're happy with it and other shareholders were happy with it. And I'll bet Ryan was pretty happy with it when he left with $9.3 million. I see that changing the situation. Is it a fair statement, however, that Rajaram did what he could to downplay the likelihood of future success for conversations with Ryan? I don't know if that's fair. I mean, you look at the reports and the reports are very, very clear. And again, I just have to keep coming back to a fundamental point. The reason for anti-reliance clauses and the Delaware cases are very clear on this. Why do we put this in? We put this in because we don't want six years and in our case, it's 10 years later to be arguing about, well, how did he put it? What exactly did he say? Did he say, you know, do you spin it a little this way? Do you spin it a little that way? What exactly did he say? And people don't even remember really what was said. I mean, that's the point of an anti-reliance clause. They say, one, we don't want to let people come in and lie, say in a contract, I didn't rely on anything outside. And then they show up in court and they say they did rely. And number two, we want finality. We don't want people coming back in 10 years later and saying, oh, well, you've kind of made this statement here that, you know, we think you were being a little too negative, as you would say. And that's the whole point of these clauses is to prevent those kinds of fights. Any further questions? All right. Melissa, you may respond. Thank you. A few responses. First, let me start with the Domen case. I know the defendants think that this is their holy grail. The reason I didn't talk about it is because it is relevant to a single argument we make in our opening brief. And in our reply brief, we explain that we understand that Domen means that with respect to the individual repurchase transaction, we had argued it was a request for shareholder action. We said we understand that's no longer the case except for this one remaining factual dispute as to whether it was an individual transaction. Domen does not have any relevance to the other arguments we're making in this case. The duty to disclose that we're talking about here, that's the bulk of our case, comes not because it's an individual repurchase transaction, but comes because that transaction included two that were themselves self-interested transactions by a fiduciary. Rajaram had a personal interest in those two provisions. That's the reasoning of the Heckman decision. It's the reasoning of the Walmart decision. It's the reasoning of the Illinois decisions on this particular issue. The other point I would make with respect to Domen is it makes very clear it's saying nothing about the fiduciary duty of loyalty. That remains intact regardless. The second point I would make is with respect to the Transdime decision. I think defendants basically concede what we started with, which is the real fight between the trial courts has to do with instances where the omissions are nothing more than the flip side of the misrepresentation. That is not primarily what we're arguing here. We're talking about active concealment. Nobody says that that is included within the scope of this. We're talking about instances where there is a separate duty to exist in the fiduciary context. Thirdly, we're talking about omissions that are not just the flip side of the misrepresentation. Just as one example, he said that the company was losing the biggest customer, IMS Health. He didn't say that that was already baked into the projections. He didn't say that this was seen as a good thing because now they could go after IMS Health's clients. He didn't say that there were a number of other customers currently in the pipeline that would more than make up for it. That's not just a flip side omission. Can't a sophisticated person who's dealing with another sophisticated person do a soft con? Isn't it okay to be a con man but just do it in a soft way rather than a hard con? It's absolutely not. That's what the whole fiduciary relationship is all about. To the sophisticated party point, if you look at these cases where there's a fiduciary relationship, Heckman and Walmart, the beneficiary is the company. It's Walmart. Walmart is sophisticated. Walmart had counsel. Walmart absolutely negotiated that agreement. The fiduciary relationship does not get mitigated or vitiated simply because the party who stands on the beneficiary side is sophisticated. As far as the facts here go, he says the whole point of an anti-reliance clause is so you're not arguing about what was said or what was not said here. Here we have written statements. In addition, we have written emails. If you want to look at the language of 3E, when it says that no representations were made, if anything, the parties were stipulating to a fiction. They weren't stipulating to a fact. We have an email from March 22nd that says something about the financial condition of the company. I think you have to understand Section 3E in the context of this case. Fourth, freedom of contract. Yes, absolutely, Delaware respects the freedom of contract. Most jurisdictions do, but it doesn't stand alone. Here you have an important counterweight on the other side. That's the fiduciary duty of loyalty. In Delaware, when these two butt heads, especially when you also have on the other side, but when these two butt heads, it's the fiduciary duty of loyalty that wins out. Finally, there was some talk about the facts in this case. This really, I think, comes from footnote four of their brief where they dispute a couple of the facts and what exactly was really said. Suffice it to say that that's not what Ryan Jr. testified to in his deposition. Suffice it to say that we have written statements that are to the contrary. I think the most important thing to understand is that that's exactly what a jury is there for. These are the types of arguments that should be made to a jury. This case shouldn't be dismissed and should not have been dismissed as a matter of law. I think I'll end where I ended my opening, which is, if this decision stands, the message to fiduciaries is clear. They can do exactly what Raj Ram did here. They can brag about it afterwards. They just have to be smart enough to sneak in, not just one contractual disclaimer, but two. Thank you. Anything further? No further questions. Thanks for the briefs and arguments. I appreciate it. They were very well done. You made it very interesting, both sides. We appreciate it because this is not the easiest case. Thank you.